SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
CHRISTOPHER L. AYERS
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: 212-584-0700
Fax: 212-584-0799
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
cayers@seegerweiss.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| CITY OF STERLING HEIGHTS POLICE & FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> RECKITT BENCKISER GROUP PLC, RAKESH KAPOOR, ADRIAN HENNAH, SHAUN THAXTER and ADRIAN BELLAMY, <br><br> Defendants. | No. <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br><br><br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff City of Sterling Heights Police & Fire Retirement System ("plaintiff") alleges the following based upon the investigation of plaintiff's counsel, which included a review of securities analysts' reports, media reports, regulatory filings and reports, and U.S. Securities and Exchange Commission ("SEC") filings by Reckitt Benckiser Group plc ("Reckitt" or the "Company"), as well as press releases and other public statements issued by the Company.  Plaintiff believes that, after a reasonable opportunity for discovery, substantial additional evidentiary support will exist for the allegations set forth herein.

## NATURE OF THE ACTION

1.     This is a securities class action brought on behalf of all purchasers of Reckitt American Depositary Shares ("ADSs") from July 28, 2014 through April 9, 2019 (the "Class Period") against Reckitt and certain of the Company's executive officers seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1367 and §27 of the 1934 Act.

3.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b).  A substantial number of the acts and omissions giving rise to the claims at issue occurred in this District.  Reckitt's U.S. corporate headquarters are located in this District, and defendants are subject to personal jurisdiction in this District.

4.     In connection with the acts and omissions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce.

## PARTIES

5.     Plaintiff City of Sterling Heights Police & Fire Retirement System purchased Reckitt ADSs during the Class Period and was injured thereby as reflected in the attached certification.

6.     Defendant Reckitt is a consumer goods and health conglomerate headquartered in the United Kingdom.  The Company maintains substantial operations in the United States, including its principal corporate offices, which are located in Parsippany, New Jersey.  Reckitt ordinary shares trade on the London Stock Exchange under the ticker symbol "RB," while its sponsored ADSs trade on the U.S. over-the-counter ("OTC") market under the ticker symbol "RBGLY."  Five ADSs represent one ordinary share.

7.     Defendant Rakesh Kapoor ("Kapoor") has served as Chief Executive Officer ("CEO") and a director of Reckitt since September 2011.  He has been called

one of the highest paid executives in the United Kingdom, receiving £25.5 million (about $32 million) in compensation in 2015. In January 2019, Reckitt abruptly announced that Kapoor would retire by the end of 2019.

8.    Defendant Adrian Hennah ("Hennah") has served as Chief Financial Officer ("CFO") of Reckitt since February 2013.

9.    Defendant Shaun Thaxter ("Thaxter") has served as the CEO of Reckitt Benckiser Pharmaceuticals Inc. both before and after its separation from Reckitt, including during the Class Period.

10.    Defendant Adrian Bellamy ("Bellamy") served as the Chairman of the Board of Directors (the "Board") of Reckitt until May 2018.

11.    The defendants referenced above in ¶¶7-10 are also referred to herein as the "Individual Defendants" and are liable under §§10(b) and 20(a) of the 1934 Act for Reckitt's fraud.

12.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Reckitt, were privy to confidential, proprietary information concerning Reckitt, its finances, operations, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Reckitt's pharmaceutical products, including Suboxone Film, as discussed in detail below. Because of their positions with the Company, the Individual Defendants had access to non-public

information about Reckitt's finances, business, markets, products and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, and attendance at management and/or Board meetings and committees thereof and reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

13.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the 1934 Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Reckitt's business.

14.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Reckitt ADSs.  The scheme: (a) deceived the investing public regarding Reckitt's business, operations and management and the intrinsic value of Reckitt ADSs; and

(b) caused plaintiff and members of the Class (defined below) to purchase Reckitt ADSs at artificially inflated prices.

## BACKGROUND TO THE FRAUD

15.    Reckitt is a consumer and healthcare company based in the United Kingdom.  Before and during the Class Period, Reckitt and its most senior executives perpetrate a scheme, which generated over $3 billion in proceeds, to facilitate opiate abuse among U.S. consumers and mislead investors and the public regarding the health and safety risks of Reckitt's key opiate product, Suboxone Film.

16.    Prior to December 2014, the Company maintained a division dedicated to opioid addiction treatments known as Reckitt Benckiser Pharmaceuticals Inc. ("Reckitt Pharma").  For many years, Reckitt Pharma's primary source of revenue was the manufacture and sale of Suboxone Tablets, a treatment for opioid addiction and the predecessor to Suboxone Film.

17.    Because Suboxone Tablets had been granted orphan drug status by the U.S. Food and Drug Administration ("FDA"), Reckitt enjoyed a period of exclusivity during which no generic competitors to Suboxone Tablets could enter the market.  This period of exclusivity was set to end in October 2009.  While the Company's Suboxone Tablet sales had grown to more than $260 million, Reckitt feared that it would lose almost all of those revenues to cheaper generics once the exclusivity period ended.

18.     In order to maintain and grow profits, senior executives at Reckitt devised a plan to switch prescribers from Suboxone Tablets to a new proprietary treatment that the Company had been developing: Suboxone Film.  Suboxone Film had similar active ingredients to Suboxone Tablets, however it was dispensed in a thin film placed under the tongue and stored in single-use foil wrappings.  Executives planned to create a marketing campaign that touted the purported safety benefits of Suboxone Film over Suboxone Tablets in order to prevent generic competition.  Key to this campaign was fabricating safety concerns with existing treatments in order to delay the entry and approval of generics for Suboxone Tablets.

19.     For example, internal Company documents discussed the "need to think creatively about a safety story" in order to "tie up generic[s]" and create a "negative safety issue" that could "prevent approval."  In 2009, Reckitt Pharma's medical director summarized the plan to exaggerate the safety risks of tablets: "***We need to develop a story about childhood exposures to set the stage for switching patients***" to Suboxone Film.[1]

20.     From the start, Reckitt executives planned to market Suboxone Film as a safer treatment "from a public health perspective" with a "less divertible/abusable formulation" and "lower risk of child exposure."  Not only were there no scientific

---

[1]    Emphasis has been added unless otherwise noted.

studies to support these claims, internal Company documents acknowledged that Suboxone Film could in fact be considered *less safe*, because "there is an incremental risk of the film since once a child ingests the film it will be nearly impossible to remove vs. tablets." In other words, internally the Company and its executives recognized that Suboxone Film potentially posed an increased risk of harm to children because once ingested, children would almost invariably suffer exposure to a full dose.

21.    Although the FDA approved Suboxone Film as an opioid addiction treatment in 2010, it rejected the Company's claims that the packaging would protect against diversion and accidental child exposure. To the contrary, the agency found that Suboxone Film was more susceptible to abuse and posed greater child safety risks than tablets. Company executives acknowledged that the FDA was "trying to deny us the ability to make a claim on additional paediatric safety of the film."

22.    Despite the FDA's findings, Reckitt decided to launch a "[f]ull [b]litz campaign" to switch users to Suboxone Film based on false representations regarding "diversion and misuse and pediatric safety." This mandate came directly from Reckitt's most senior executives. For example, in September 2010, the Company's former CEO, Bart Becht, instructed Reckitt Pharma sales personnel to promote Suboxone Film as "*safer*" and to "convert [patients] from tablets to films, thereby protecting our Net Revenues in the USA." In March 2011, Becht materially

and falsely stated in Reckitt's 2010 Annual Report that Suboxone Film was "**better from a child safety point of view, mak[ing] it more attractive for doctors to prescribe**." Similarly, in July 2012, Reckitt's new CEO, defendant Kapoor, oversaw an investor presentation that fraudulently portrayed Suboxone Film as "**less divertable and abusable**." Marketing materials approved by Company executives also highlighted Suboxone Film's "advantages," which falsely included "**Public safety – reduced pediatric exposure**."

23.    These and similar misstatements remained alive and uncorrected during the Class Period. Defendants knew, or were reckless in not knowing, that such statements were false and misleading when made. In addition to the FDA letter and the Company's own internal analyses, Reckitt received data from contractors it had hired demonstrating that Suboxone Film was more frequently abused and involved in more accidental child exposures than Suboxone Tablets. Similarly, in November 2012, Reckitt Pharma's Medical Director and VP for Clinical Affairs internally discussed the increased dangers that Suboxone Film posed to children. Reckitt Pharma's own compliance committee determined that the Company's promotional materials presented "compliance risks," and Reckitt Pharma managers determined that "**[u]nder no circumstances**" could the Company truthfully make the claim that Suboxone Film posed less risk to children.

24.     At the same time that Reckitt was flooding the public with higher risk Suboxone Film under false pretenses, it fabricated a pediatric safety scare with existing treatments to further spur conversion to its new drug.  In 2012, Reckitt's General Counsel emailed defendant Kapoor, Reckitt's CFO defendant Hennah, and other Company executives instructing them not to "create any emails or other documents" regarding the plan.  Around this time, Reckitt had hired contractors to study the child safety profile of film versus tablets.  When the contractors concluded that there was no basis to determine that Suboxone Film was safer than Suboxone Tablets, the Reckitt Pharma manager overseeing the project dismissed their interim report as a "worthless, empty shell."

25.     Shortly thereafter, Reckitt discontinued Suboxone Tablets and submitted a petition to the FDA stating that the reason for the discontinuance was "***due to safety concerns***."  Defendant Kapoor approved the petition, even though he knew the proffered reason was false and that the real reason was to prevent generic competition.  The petition also included an executive summary of the contractors' findings, which had been altered to support the Company's false narrative.  Concurrent with this doctored FDA petition, the Company engaged in a massive misinformation campaign to doctors, patients and other healthcare professionals claiming that it had discontinued Suboxone Tablets because of the risks the drug posed to children.

26.     To further increase the sale of Suboxone Film, Reckitt courted physicians that it knew were over-prescribing the drug and/or prescribing it for clinically unwarranted uses.  The Company maintained a physician referral program called "Here to Help" that served doctors "like a concierge service."  It also provided marketing materials, billing advice and access to lunch and dinner events, even for physicians that it knew were facilitating drug abuse.

27.     Defendants' scheme to fraudulently inflate sales of Suboxone Film was a success.  Between 2010 and 2014, the Company's revenues from sales of the drug increased ten-fold to over $840 million annually.  This included more than $500 million in payments from Medicare and Medicaid.

28.     Although Reckitt Pharma was spun off from Reckitt in December 2014, becoming a company known as Indivior plc ("Indivior"), the Company and its executives continued to conceal their fraud throughout the Class Period.

29.     Despite defendants' efforts, the truth began to leak out on July 24, 2017, when the Company announced, in connection with its second quarter 2017 financial results, that it had recorded a £318 million charge related to ongoing U.S. Department of Justice ("DOJ") and U.S. Federal Trade Commission ("FTC") investigations into its former Reckitt Pharma operations.  On this news, the price of Reckitt ADSs dropped 5%.  Then, on February 19, 2018, Reckitt announced, in connection with its full year 2017 financial results, that it had recorded an

exceptional charge of £296 million due to the investigations, and that the investigation now also involved the California Department of Insurance. On this news, the price of Reckitt ADSs declined more than 10%. Finally, on April 9, 2019, the DOJ filed a criminal indictment against Reckitt Pharma (now Indivior), which detailed a multi-billion-dollar scheme to defraud the public and the Company's investors through the marketing and sale of Suboxone Film. On this news, the price of Reckitt ADSs again declined over 6%.

30.    Ultimately, Reckitt agreed to settle the federal investigations into its marketing and sale of Suboxone Film for $1.4 billion. At the time, the settlement was called the "largest opioid settlement in US history."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

31.    Prior to and throughout the Class Period, defendants artificially inflated the trading price of Reckitt ADSs by issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, set forth below, not false and misleading.

32.    The Class Period begins on July 28, 2014. On that date, Reckitt issued a press release announcing its financial results for the first half of fiscal 2014 ("1H14 Release"). The 1H14 Release stated that Reckitt had achieved net revenues of £4.7 billion, operating profit of more than £1 billion and net income of over £800 million for the first half of the year, which included sales from Suboxone Film. In addition,

the 1H14 Release stated that Reckitt had earnings per share ("EPS") of 111.1p during this time frame. The 1H14 Release also quoted defendant Kapoor as stating that Reckitt Pharma had "'the potential to deliver significant long term value creation as a stand-alone business'" and would therefore be demerging from Reckitt. According to the release, "[a] stand-alone business will be best placed to create value for shareholders as it manages the challenges and seizes the opportunities within the field of addiction." The 1H14 Release stated that Reckitt Pharma accounted for £344 million in net revenue (or 7% of total Company net revenues) and £183 million in operating profit (or about 17% of total Company operating profits) during the first half of the year. It also stated that Reckitt Pharma had an adjusted operating margin of 53.2%, more than double the Company's average.

33. The 1H14 Release described Reckitt Pharma as experiencing "strong" volume growth in Suboxone Film despite a more competitive market environment. It stated in pertinent part:

**Reckitt Benckiser Pharmaceuticals (RBP)**

HY 2014 net revenue was £344m, a decrease of -8% (constant). In Q2 net revenue was £174m, a decrease of -5% (constant). ***The underlying volume growth in prescriptions in the USA throughout the first six months continued to be strong with low double digit growth in this undertreated area of addiction***. There was some erosion of volume market share which exited the period at 63%. There has also been some pressure on pricing, particularly in the second quarter, due to the competitive environment.

> *In non USA markets, progress made in helping more patients continues to be partially offset by government imposed price reductions in a number of markets*.

> Operating margin declined by -380bps to 53.2% due to a combination of negative volume leverage, pricing, and continued investment in the clinical pipeline.

> A third generic buprenorphine / naloxone tablet was approved in July in the USA and we will also experience pressure from the formulary removal from part of the United Healthcare business from 1 July.

34.    The 1H14 Release also claimed that Reckitt and its executives followed a stringent compliance program to ensure that the Company adhered to applicable laws and regulations in its business practices, stating: "The Group maintains and continues to improve a robust compliance training programme and ensures that all executive managers sign an annual disclosure and reporting document certifying compliance with the Group's Code of Conduct."  Reckitt's Code of Conduct, meanwhile, was signed by defendant Kapoor and claimed that all Reckitt employees "must be seen to be dealing even-handedly and honestly with all its consumers, customers, suppliers, employees, contractors, governments & regulators and others with whom the Company has a relationship," and also that "[a]ll employees and contractors must be aware of and observe all laws and regulations governing their activities."

35.    The Individual Defendants reviewed and approved the 1H14 Release, which quoted defendant Kapoor at length, and thus were responsible for its contents.

In addition, the 1H14 Release was signed by defendants Kapoor and Bellamy, who certified that the information contained therein was prepared in accordance with international accounting standards and fairly presented the risks and uncertainties facing the Company, among other representations.

36.    Also on July 28, 2014, Reckitt hosted a conference call with analysts and investors led by defendants Kapoor, Hennah and Thaxter.  Defendant Hennah presented the financial information included in the 1H14 Release, which included the revenues, net income and earnings from the sale of Suboxone Film and a discussion of relevant market conditions.   He also provided the following commentary on the purportedly strong volume growth in Suboxone Film:

> ***In RBP, the minus 5% revenue decline in quarter 2 was determined by a combination of continuing strong market growth, most notably continuing low double-digit growth and buprenorphine prescription volume in the United States***; by a modest reduction in market share in the United States Suboxone market; and by some price pressure.
>
> ***Looking forward to the rest of the year, we expect continuing strong market growth***.  Our [film] share in the United States will, however, be reduced modestly by the changes in the United formulary for some of their business, and the approval of [a] third generic Suboxone tablet will also add to the share and price pressure in some parts of the market.

37.    Later on the call, defendant Kapoor expounded on the Company's rationale for spinning off its Reckitt Pharma subsidiary.  He claimed that the strong success of Suboxone Film had made Reckitt Pharma a "global leader[]" in addiction

treatment, and that it was on a solid footing for continued growth.  He stated in pertinent part:

> So let me just start with a couple of words on this business, which is: Why do we believe that a standalone RBP is the right thing to do? So, well, let's start with the first thing.
>
> I've always said from January 2012 onwards I've said that RBP is not core to RB.  We do not want to be a prescription pharmaceutical company, yet it's very important to wait for a time when we will see the impact of generic entry into its heartland.  We will wait for the time to see what the impact of that will be in terms of market growth rate, in terms of sustainability of film, and then make a determination 12 months or so after that what the right thing to do is.
>
> ***Well, we now know nearly 12 months after the launch of the film, of the generic tablet, that RBP has actually created a global leadership position in the world of addiction treatment, which is a fast-growing under-served market***.
>
> ***It has also got substantial, I would say, near-term cash flows, mainly from its Suboxone franchise***.  But although this franchise is under competitive pressure, it still has strong defenses, as you will see later today; [IP], patient and [pre-op references].

38.    Defendant Kapoor also represented that Reckitt Pharma had a "sustainable business" model and was positioned for "strong medium and long-term growth."  He stated in pertinent part:

> ***We believe we have demonstrated strong medium and long-term growth opportunities for this business***, and you will see today from Christian the pipeline progress on what we have done with RBP.
>
> But beyond the pipeline that we've developed in-house, we've also signed two very interesting and important licensing deals which we've announced recently: The nasal naloxone spray; and the other one is in the entirely new field of alcohol dependence.

And finally, there are geographic expansion opportunities like the ones that we've used very effectively in Australia that we still believe we can go for.

**I believe RBP has created a sustainable business on the back of which it can find its true potential.**

39.    Defendant Hennah then introduced defendant Thaxter, the CEO of Reckitt Pharma, stating that he would provide "more information to investors" in the following main areas: "The prospects for Suboxone film in the USA, including very importantly the strength of its IP protection; the content stage and strength of the pipeline; potential for licensing and business development-led growth; and the potential for growth outside the USA."

40.    In defendant Thaxter's prepared remarks, he claimed that Suboxone Film was at the forefront of helping patients suffering from opioid addiction. He claimed the success of the drug was due to its superior performance, safety and efficacy and that the predominance of film sales over tablet sales was the product of the Company's unrelenting focus on patient well-being. He stated in pertinent part:

First of all, one thing that's been consistent in the 12 years that I've been leading this business is that all patients around the world have unrestricted access to high quality treatment services for the chronic relapsing conditions of addiction has been the driving force and the vision of the business. **The focus on the patient is absolutely essential. To have a leadership model that focus[es] on partnership with governments and all stakeholders to bring better quality treatments to patients is what's driven the success of our business, and will continue to drive the success of our business in the future.**

**The impact of bringing a patient out of addiction treatment into addiction treatment truly transforms the life of that patient and the**

*people around them and their families and friends, and therefore has a positive impact on the communities in which they live.*

We know that the lead market that we've been working in is the US; that's where the majority of revenues come from; and therefore, is the focus of my next few slides.

Two years ago, this is where the business was at. The blue star represents the Suboxone film share, the pink star was the Suboxone tablet business at the time, the orange star represents the generic mono buprenorphine and the yellow star represents the recent branded competitor; obviously hadn't launched at that time.

*So in the nine months following where we left off, we continue to drive conversion of patients from tablets onto the film driven by the preference of the patient for the film. They liked it, they preferred it. We presented data previously. The physicians were observing a superior treatment outcome. So we saw by March of last year that the film share had grown to 70% and the tablet business had come down to 15%.*

*We then withdrew the tablet.* At the same time, we experienced the launch of two generic competitors to the Suboxone tablet. So if you look at the bottom of the chart, you see our branded tablet disappeared and was replaced by the generic tablet. No surprise there. What I think absolutely surprised everybody was the level of resilience that the Suboxone film showed in the face of this generic competition.

The next material event was last September when Zubsolv, a branded competitor, entered the market. And again, we saw a relatively small impact in the first few months.

We then had the announcement which was made public of the [CBS] formulary loss. And once again, the film share held up and proved its resilience, even in the light of formulary adjustment. And what we actually saw with the film was about half the level of loss from the CBS business that you would have expected to see had you modeled with standard industry analogs.

So we now await to see what the impact will be of the recently announced third generic tablet competitor. This will, of course, bring

new pressures upon us, and we expect that we will continue to outperform analogs as we move forward.

41.    Defendant Thaxter credited the exceptional sales growth in Suboxone Film to the legitimate sales efforts of Reckitt's salesforce, without mentioning defendants' scheme to mislead the public about the drug's safety and efficacy.  He stated in pertinent part:

> *So overall, two years ago, we had a film share of 55%, tablet share of 30%, and no generics.  In the two years since then, when all the uncertainty over the future of the business in the US was in question, we've actually grown our film share from 55% to 61%.  Not only have we grown it, but we've grown it in the context and presence of some pretty aggressive competition*.

> *We've maintained our double-digit market growth.   This is something we're very good at.   We continue to invest in expanding the network of physicians who are actually providing treatment for patients, and we continue to drive the communication to drive patients into treatment.  And we're very confident that we will continue to be successful here*.

> *There's a lot of headroom for growth in the market.  As proud as we are, there's 5 million patients who have benefited from treatment since we started business.  There's still a lot more patients who need to come in who haven't been treated yet*.

Our pipeline has moved on considerably.  In the last two years, we've met all of our KPIs that we set ourselves, passed a number of regulatory hurdles since we last met.  So we're very pleased with our progress here.  And we have also licensed in two new technologies, which Rakesh referred to.

One is arbaclofen placarbil for the treatment of alcohol use disorders; and the other is nasal naloxone, which is an overdose rescue medication which we'll talk a little bit more about.  Both of these were on our target list that are in your presentation pack that we said two

years ago were in the areas that we were looking to focus and expand our business.

And there are more opportunities moving forward. We continue to look for opportunities in cocaine, meth amphetamine and cannabis addiction.

*So what about the prospects moving forwards [sic] for the Suboxone film? Well, the data has already demonstrated that it is very clearly the preferred product, not only by patients, not only by physicians, but also by payers*.

42.    Defendant Thaxter also stressed that Suboxone Film's superiority to alternatives had led to a preference for the drug by patients, doctors and payors. He stated in pertinent part:

*We know that patients prefer the medication experience. Physicians are very happy that their patients are stable and doing well on their medication. And all of this, of course, means that payers are getting a better return on the investment that they are making in providing a treatment to the patient and making that treatment available*.

The physician treatment network continues to expand. There are over 25,000 registered physicians. They have excellent access; over 91% formulary access. So there's no problem with patients being able to access physicians or their medication. And the film has strong patent protection, multi-layered protection that now extends to 2030.

So here's just some specific data to share with you, what patients and physicians have said about the film. *But I think the resilience of the film and its market share performance is the best indicator of their preference*.

*So not only do patients and physicians prefer the film, so do payers. And this preference of the patient and the physician is very important to the payer, because the payer doesn't want to disrupt patients who are stable in treatment*. Whilst they want to provide access to other medications that might cost them less money, they don't

- 19 -

want to disrupt the patient.  So if the patient and the physician are happy, that's very compelling.

Not being in treatment has a high cost to society.  Therefore, there's a very compelling pharmaco-economic benefit to payers if they can retain patients in treatment.  So a stable, happy patient is a good patient.

We continue to invest, and I'll talk more about this in a moment, in abuse deterrents.

43.    Defendant Thaxter further praised the purported safety of Suboxone

Film, which he claimed had a lower potential for abuse.  He stated in pertinent part:

**Since we've launched each of our products, each product has been** **designed with the intent of being a lower potential for abuse and** **misuse than the previous products on the market.**

And in addition to all these very important clinical benefits, we partner the pharmaco-economic story with a commercial rebate to make the whole package attractive to payers.

And I think this explains why we have 75% of patients [that] can access this medication at Tier 2, which means it's a lower level of co-pay.  We obviously offer the patients a coupon to help offset that co-pay.  So from a financial affordability perspective for the patient, this is very attractive.  It works well for the payer, and that's why we see about 90% of all prescriptions getting approved.

When you actually look at the economic argument, well, what's the ratio here?  Well, according to the WHO, for every $1 you spend on treatment, society saves $12.  So this really is a very compelling reason for people who pay for treatment why they should pay for treatment.  It's very motivating for governments around the world, and it's also very compelling for commercial payers.

So in the short term, we can expect to continue to benefit from market growth, which is something we get better and better at as time goes on.  We will see modest pressure in the near term from our competition, particularly from the third generic.  And we will continue

to invest in our pipeline so that we have opportunities to accelerate our growth when they come to market.

44.     Moreover, defendant Thaxter represented that Reckitt Pharma was successfully expanding its strategy to grow Suboxone Film sales in the United States to international markets.  He stated in pertinent part:

> So we've talked about the US, of course, because it is the majority of today's business, but that really means that there must surely be a lot of opportunity around the world to grow and expand the business.
>
> **We have a very successful market development model whereby we can go to markets that are very against treating opioid dependence and other disorders**.  They may have a punitive attitude; they may incarcerate people who are found to be using drugs. ***And we . . . can meet those markets successfully through a phase of normalization and medicalization of the disease, and ultimately to provide general treatment in primary care, such as we've done in the US***.
>
> ***So we've deployed that model very successfully in Australia, and I'd just like to show it as one example, because it's also a market where we have replaced the Suboxone tablet with the film***.
>
> ***So the film is being rolled out around the world***.  We have it in the US, Australia, Malaysia.  The film is coming to Canada, Europe. We're making good progress in China.  In fact, full credit to the Chinese Government who have recently decriminalized opioid use.  You're now not arrested and put in jail if you're found to be using opioids by the Chinese Government.  You're found by the police and you have to go for treatment, which I think is a very, very progressive mindset and a big shift.  So full credit to them for that.

45.     Defendant Thaxter also stated that Reckitt Pharma employed robust internal controls and compliance procedures, which he represented had been overseen and supported by defendant Kapoor.  He claimed that these procedures

- 21 -

ensured that the "business is really driven by a patient-centric focus." He continued in pertinent part:

> *So we have systems. We have processes. We've got compliance. We have regulatory infrastructure. We've got our own sales force; a very talented group of people all around the world who behave as clinical liaisons and partner with governments and have outstanding relationships with physicians to provide treatment for patients. And that's been a key driver of our success.* We do, of course, share some services with RB. We're very grateful for the support we've had from HR, finance and IS, and the product manufacture through the supply chain.

> Over the recent months, we've been working very hard to make sure that we have a standalone model so we could operate independently. And to help us get their transitional services, agreements are in place for all of the areas of overlap.

> *So as I've said, our business is really driven by a patient-centric focus. That's the passion, that's the drive, that's where we are going. And the reason we're able to get there so successfully is because we've built that on a very, very, very solid platform. And the solid platform is the Reckitt Benckiser culture and the discipline and the mindsets that drives a successful business.*

46.    After defendant Thaxter's prepared remarks, an audience member questioned him regarding a new injectable under development: "[C]learly, on the tablets, you actually stopped doing that because you said the film was far superior and safer, and so on and so forth. I presume the injectable is even better than the film, so should we expect the same to happen to film, or do you think the two are likely to be sustained?"

47.    Defendant Thaxter responded by once again claiming that Suboxone Film had experienced success because it was a far superior product than the tablet, stating:

> *What I think is important to recognize is that we're not in the business of forcing the market or patients to do anything.  I think that we put the film proposition out there for patients and physicians, and we stated our case as to why we thought it was a better technology. And it was really the rapid uptake by patients and physicians, as for the preference*.

48.    On October 21, 2014, Reckitt issued a press release announcing its financial results for the third quarter of 2014 (the "3Q14 Release").  The Individual Defendants reviewed and approved the press release, which quoted defendant Kapoor at length, and thus were responsible for its contents.  The 3Q14 Release stated that the Reckitt Pharma segment had achieved net revenues of £161 million for the quarter, which included sales from Suboxone Film.  The 3Q14 Release provided the following update regarding Reckitt Pharma, which claimed that volume growth in Suboxone Film had remained robust despite increased competitive pressures:

**Pharmaceuticals (RBP)**

> *YTD 2014 total net revenue was £505m a decrease of -8% at constant rates (Q3 LFL growth of -9%).  The underlying volume growth in prescriptions in the US continues to be strong with low double digit volume growth in line with recent market trends*.

> *Volume Film share of total buprenorphine prescriptions in the US has remained robust, at 60% in the face of increased pricing pressures from generic and branded tablets and removal from*

*formulary of part of United Healthcare from 1 July*.  A fourth generic buprenorphine/naloxone tablet was approved in September, and a branded film competitor is expected to launch in late Q4.  We expect trends seen in Q3 to continue into Q4.

*Whilst there continues to be clear patient and physician preference for Suboxone Film*, as we have always said, this increased competition in the US market place is expected to drive continued pricing pressure, and further share loss in more price sensitive payors.

In non-US markets, *progress made in helping more patients* continues to be offset by government imposed price reductions in a number of markets.

We continue to make good progress on our clinical pipeline.

49.    Also on October 21, 2014, Reckitt hosted a conference call with analysts and investors led by defendants Kapoor and Hennah.  In his prepared remarks, defendant Hennah presented on the financial information provided in the 3Q14 Release.  He also claimed that Reckitt Pharma was continuing to experience "strong market growth" and that "[t]here continues to be very clear patient and physician preference for Suboxone Film."  He stated in pertinent part:

Now turning to RBP.  *The underlying volume growth in buprenorphine prescriptions in the United States continues to be strong*.  As expected, RBP's share of total buprenorphine prescriptions declined slightly, to around 60%.  This was the result of increased pricing pressures from generic and branded tablets; and removal from formulary of part of United Healthcare from July 1.

*Strong market growth, some share loss, and some price pressure led to the 9% reduction in constant currency RBP revenue in quarter 3*.  We expect trends seen in the third quarter, and their impact on our results, to be broadly similar in the fourth quarter.

A fourth generic buprenorphine/naloxone tablet was approved in September. In addition, a branded film competitor may launch a competing product in quarter 4. We firmly believe that this product breaches our IP protection and we have initiated the corresponding legal process.

***There continues to be very clear patient and physician preference for Suboxone Film***. However, we have always said that increased price competition in the US marketplace will drive some further share loss among more price-sensitive payors. We continue to expect this dynamic to play out in 2015.

50. Later, in response to an analyst's question regarding generic pricing pressures on Suboxone Film, defendant Hennah offered assurances that the superior qualities of the film would continue to offer competitive advantages, stating: "For the rest of the market, we've – the advantages we have, the clinical advantage we have, the preference we have, which is very clear among the patients and is very clear among the clinicians, is reaffirmed every day we're out there, is reaffirmed continually in the market data. We expect that to be a very, very strong influence in the rest of the market."

51. On November 17, 2014, Reckitt issued a press release announcing the demerger of Reckitt Pharma (the "Demerger Release"). The Individual Defendants reviewed and approved the Demerger Release, which quoted defendants Thaxter and Bellamy at length, and thus were responsible for its contents. The Demerger Release described Reckitt Pharma, now named Indivior, as a "leading international addiction business." It stated in pertinent part:

- ***The RBP business is a leading international addiction business with net revenues of $1.2 billion and net income of $489 million for the year ended 31 December 2013*** (calculated under IFRS for RBP on a "carve out" basis, for which see details in the prospectus published later today).  ***80% of net revenues were in the United States, where the RBP business has the leading position in products treating opioid addiction, a growing market.  Profits before tax for the year ended 31 December 2013 were $695 million.  Gross assets as at 30 June 2014 were $455 million***.

- ***Suboxone Film remains the leading treatment for opioid addiction in the US market with approximately 60% market share of the buprenorphine market by volume***.

52.    The Demerger Release also quoted Reckitt Pharma's new chairman of the board, who stated that "'Indivior, under the leadership of Shaun Thaxter, has built a global, industry leading company in addiction treatment'" and that "'[t]he business has a profitable opioid addiction business and a strong pipeline that has the potential to revolutionise how the chronic disease is treated worldwide.'"  The release quoted defendant Thaxter as stating in pertinent part:

> "I look forward to partnering with the Indivior Executive Committee and Board to further build upon the strong foundation set by Reckitt Benckiser Pharmaceuticals under the guidance of RB as we transition to a sustainable, stand-alone organisation.  Our full team – from the Executive Committee to the Board to our employees – is energised by the opportunity ***to continue leveraging our unique patient-focused leadership model to expand availability of addiction treatment and improve patient lives across the globe***."

53.    On February 11, 2015, Reckitt issued a press release announcing its fourth quarter and full year 2014 results (the "FY14 Release").  The Individual Defendants, other than defendant Thaxter, reviewed and approved the press release,

which quoted defendant Kapoor at length, and thus were responsible for its contents. The FY14 Release stated that Reckitt had achieved £3.2 billion in net income for the year, which included sales from Suboxone Film. In addition, the FY14 Release stated that Reckitt had EPS of 441.1p during this time frame. The FY14 Release stated that Reckitt Pharma accounted for £677 million in net revenue (or 7% of total Company net revenues) and £369 million in operating profit (or about 15% of total Company operating profits) for the year. It also stated that Reckitt Pharma had an adjusted operating margin of 54.5%, more than double the Company's average.

54. The FY14 Release provided additional commentary on Reckitt Pharma, which had been demerged in December 2014, stating in pertinent part:

> *Net income (adjusted) attributable to RBP for 2014 was £278m*, a decrease of -20% (-16% constant). This was driven by net revenue growth of -8% at constant rates (Q4: -9%) *with strong volume market growth in the US offset by some share decline and pricing. Operating margins were 54.5%*, a decline of -640bps due primarily to the decline in net revenue, and continued investment in both the pipeline and the clinical sales force.

(Footnote omitted.)

55. Also on February 11, 2015, Reckitt hosted a conference call with analysts and investors led by defendants Kapoor and Hennah. In his prepared remarks, defendant Hennah presented on the financial information provided in the FY14 Release, which included the revenue, net income and earnings from the sale of Suboxone Film and a discussion of relevant market conditions. He also stated

that Reckitt Pharma, now Indivior, had "GBP1.4 billion of net income in half 2, GBP1.6 billion in the full year. . . . The GBP1.4 billion net income in half 2 comprises both the trading performance of Indivior up to December 23, 2014, and the gain arising on demerger. Revenue and profit progressed in line with expectations."

56.    In March 2015, Reckitt issued its 2014 Annual Report, which contained the financial information provided in the FY14 Release, including the revenue, net income and earnings from the sale of Suboxone Film and a discussion of relevant market conditions. The 2014 Annual Report had a section entitled "Realising value from RB Pharmaceuticals (RBP)," which claimed that Reckitt shareholders had received £1.3 billion in gains from the demerger, mostly from the value of Reckitt Pharma's Suboxone franchise. It stated in pertinent part:

> Prior to demerger, Indivior PLC was managed as RBP, an independent, global, specialty pharmaceutical business, with its own management team focused solely on addiction treatment and the co-morbidities of addiction. ***It was the Board's view that a stand-alone business will be best placed to create value for Shareholders as it manages the challenges and seizes the opportunities within the field of addiction***. We also believed that Indivior PLC would be a more attractive partner for business development opportunities as a stand-alone and separately managed entity.

> Similarly, we believed RB Shareholders would benefit from the single-minded focus of top management on its core businesses in the Health, Hygiene and Home sectors.

> ***Adjusted net income attributable to RBP in 2014 was £278m, a decrease of -20% (-16% at constant exchange rates). This was driven***

> *by a net revenue decline of -8% at constant rates with strong volume market growth in the US offset by some share decline and pricing. Operating margins were 54.5%*, a decline of -640bps due primarily to the decline in net revenue, and continued investment in both the pipeline and the clinical sales force. *Additionally, a gain on demerger of £1,282m has been recognised*.

(Footnote omitted.)

57.    Defendant Kapoor was quoted in the 2014 Annual Report as stating that Reckitt had "delivered on our promise to demerge the pharmaceutical business," which had "the potential to deliver significant long-term value to Shareholders."

58.    The 2014 Annual Report also stated that Reckitt employed a robust three-step regulatory compliance process overseen by management to ensure that the Company implemented effective internal controls over financial reporting.    It described this process as follows:

> •    **The first line of defence** is provided by management through the controls, policies and routines RB has in place to deal with risks in the day-to-day running of the business.  Controls are designed into systems and processes to appropriately mitigate risks at source. Adequate managerial and supervisory controls are then overlaid locally to verify compliance and to highlight and promptly address any breakdown in basic controls;

> •    **The second line of defence** is provided by geographical and functional management oversight structures, such as Areas, Finance, HR, Supply and Category functions.  Management here sets policies, provides direction and maintains oversight of the first line; and

> •    **The third line of defence** is provided independently by internal and external audit teams, who challenge and report on the accuracy and adequacy of assurance provided by the first and second lines.

59.     Similarly, the 2014 Annual Report stated that Reckitt and its employees adhered to the Company's Code of Conduct and a rigorous internal control and risk management regime overseen by the Company's most senior officers and directors. It summarized the key elements of this purported strict legal and regulatory compliance regime in pertinent part as follows:

> RB's control environment is supported by a Code of Conduct, on which employees receive training annually, and a range of policies on corporate responsibility. Other key elements within the internal control structure are summarised as follows:
>
> • **The Board and management** – the Board approves strategy and performs an advisory and supervisory role, with the day-to-day management of the Company being undertaken by the CEO supported by the Executive Committee. The CEO and other Executive Committee members have clearly communicated RB's vision, strategy, operating model, values and business objectives across the Group;
>
> • **Organisational structure** – during the year ended 31 December 2014, RB operated three Area organisations covering ENA, LAPAC and RUMEA together with RB Pharmaceuticals (demerged on 23 December 2014) and Food, and centralised functions covering category development, supply, sales, finance, legal, information services and human resources, as well as an independent internal audit function. Throughout the organisation, the achievement of business objectives and the establishment of appropriate risk management and internal control systems and processes are embedded in the responsibilities of line managers;
>
> *     *     *
>
> • **Management reporting** – there is a comprehensive system of management reporting. The financial performance of operating units and RB as a whole are monitored against budget on a monthly basis and are updated by periodic forecasts. Area and functional executives also perform regular strategic reviews with their

management teams, which incorporate an assessment of key risks and opportunities . . . .

60.    The 2014 Annual Report also highlighted Reckitt's purported internal controls, reporting and risk oversight as reasons that investors could take comfort that the Company was adhering to applicable legal requirements and accurately reporting all material risks to investors.  It stated in pertinent part as follows:

- **Risk management** – as part of the ongoing risk and control process, operating units review and evaluate risks to the achievement of business objectives and the Board reviews those significant risks which might impact on the achievement of corporate objectives.  Mitigating controls, together with any necessary actions, are identified and implemented.  A summary of the most significant risks faced by RB is included in the Strategic Report on pages 24 to 27 and full details of RB's relationships and Principal Operating Risks are set out on pages 126 to 132;

- **Operating unit controls** – each operating unit maintains a system of internal control and risk management which is appropriate to its own business environment.  Such controls must be in accordance with Group policies and include management authorisation processes, to ensure that all commitments on behalf of RB are entered into only after appropriate approval.  In particular, there is a structured process for the appraisal and authorisation of all material capital projects;

- **Compliance controls** – the Group maintains a compliance control programme that includes an independent and anonymous whistleblower reporting system, systematic reviews by the internal audit function, annual management reviews and personal compliance certification as well as specialised training in specific areas and functions of the business.  Management provides the Board with regular updates on the compliance controls of the Group and considers recommendations for continuous improvement; and

- **Monitoring** – the effectiveness of the system of internal control and risk management is monitored regularly through a combination of management review, self-assessment, independent

review through quality assurance, environment, health & safety and regulatory audits, as well as independent internal and external audit. The results of internal and external audit reviews are reported to and considered by the Audit Committee, and actions are taken to address any significant control matters identified. The Audit Committee also approves annual internal audit plans and is responsible for performing the ongoing review of the system of internal control and risk management on behalf of the Board.

61.    The Individual Defendants, other than defendant Thaxter, reviewed and approved the 2014 Annual Report, which quoted defendants Kapoor and Bellamy at length, and thus were responsible for its contents. In addition, the 2014 Annual Report was signed by defendants Kapoor and Bellamy, who certified that the information contained therein was prepared in accordance with international accounting standards and fairly presented the risks and uncertainties facing the Company, among other information.

62.    The statements referenced in ¶¶32-61 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by defendants:

(a)    that defendants had engaged in a scheme to artificially inflate the sales of Suboxone Film by more than $3 billion by falsely touting the drug's purportedly superior efficacy and safety as compared to tablets;

(b)     that, contrary to defendants' public statements, the FDA and internal Company documents had concluded that Suboxone Film posed a potentially greater risk of abuse and child endangerment than other available treatments;

(c)     that defendants had fabricated a safety scare involving Suboxone Tablets in order to unlawfully delay and prevent generic competition;

(d)     that defendants had engaged in a massive marketing campaign that had misrepresented the purported benefits of Suboxone Film as compared to Suboxone Tablets to doctors, healthcare providers, government regulators and investors;

(e)     that defendants had encouraged Suboxone sales through medical providers that they knew were overprescribing the drug, facilitating the drug's abuse and/or prescribing it in a careless and clinically unwarranted manner, often to hundreds of individuals at a time;

(f)     that, as a result of (a)-(e) above, Reckitt's revenues, net income and earnings were artificially inflated and the product of illicit business practices; and

(g)     that, as a result of (a)-(f) above, Reckitt and Reckitt Pharma were exposed to extraordinary undisclosed legal and reputational risks that could result in billions of dollars in fines, lost business and legal judgments or other monetary penalties.

63.     Even after the demerger of Reckitt Pharma, defendants continued to conceal their role in misleading the public and investors regarding the true risks and benefits of Suboxone Film.  For example, the Company's annual shareholder reports continued to highlight Reckitt's purported compliance with applicable laws and regulations and its patient-centric approach to business.    Among other misrepresentations, these reports touted Reckitt's Code of Conduct, stating in pertinent part:

> RB has developed a Code of Conduct on which employees must undertake training.  This training includes reminding employees of the Group's strict policies on reporting of any adverse events in relation to its products, as well as the availability of an independent and anonymous whistleblowing facility.  Together they help ensure a solid backbone of ethical, responsible behaviour amongst RB's employees, providing an extra layer of support to the internal controls with an intrinsic awareness of RB's policies on corporate responsibility.

64.     Despite defendants' efforts, the truth began to leak out on July 24, 2017, when the Company announced, in connection with its second quarter 2017 financial results, that it had recorded a £318 million charge related to the ongoing DOJ and FTC investigations into its former Reckitt Pharma operations.  On this news, the price of Reckitt ADSs dropped 5% to close at $20.34 per ADS on July 24, 2017 on abnormally high trading volume.  However, because defendants failed to disclose the truth about their fraudulent scheme to artificially inflate sales of Suboxone Film through fraud and misrepresentation, the price of Reckitt ADSs remained artificially inflated.

65.     Similarly, on February 19, 2018, Reckitt announced, in connection with its full year 2017 financial results, that it had recorded an exceptional charge of £296 million due to the DOJ and FTC investigations, and that the California Department of Insurance was also now investigating Reckitt.  On this news, the price of Reckitt ADSs declined more than 10% to close at $16.76 per ADS on abnormally high trading volume.  However, because defendants failed to disclose the truth about their fraudulent scheme to artificially inflate sales of Suboxone Film through fraud and misrepresentation, the price of Reckitt ADSs remained artificially inflated.

66.     Then on April 9, 2019, the DOJ filed a criminal indictment against Reckitt Pharma (now Indivior), which detailed a years-long scheme to defraud the public and the Company's investors through the marketing and sale of Suboxone Film that had generated more than $3 billion in illicit scheme proceeds.  The 28-count criminal indictment charged Indivior with a multitude of felonies, including conspiracy and mail, wire and healthcare fraud, and directly implicated the top executives of Reckitt and Reckitt Pharma.  On this news, the price of Reckitt ADSs declined over 6% to close at $15.87 per ADS on April 10, 2019 on abnormally high trading volume.

67.     Ultimately, Reckitt agreed to settle the federal investigations into its felonious marketing and sale of Suboxone Film for $1.4 billion.  At the time, the settlement was called the "largest opioid settlement in US history."

68.    As a result of defendants' wrongful acts and omissions, plaintiff and the Class purchased Reckitt ADSs at artificially inflated prices and suffered significant losses when the relevant truth was revealed in part over time.

## ADDITIONAL SCIENTER ALLEGATIONS

69.    As alleged herein, defendants acted with scienter in that they knew the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and in actions intended to manipulate the market price of Reckitt ADSs as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Reckitt, their control over, and/or receipt or modification of, Reckitt's allegedly materially misleading misstatements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Reckitt, participated in the fraudulent scheme alleged herein.  The adverse developments at issue also impacted the Company's most important revenue streams and directly involved the Company's most senior executives, including the Individual Defendants, as detailed in the DOJ indictment. The Individual Defendants also received millions of dollars in performance

compensation, bonuses and other remuneration for their role in the fraudulent scheme. As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

## LOSS CAUSATION/ECONOMIC LOSS

70.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Reckitt ADSs and operated as a fraud or deceit on purchasers of Reckitt ADSs. When the truth about Reckitt's misconduct was revealed over time, the value of the Company's ADSs declined precipitously as the prior artificial inflation no longer propped up the ADSs' price. The declines in the price of Reckitt ADSs were the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price declines negate any inference that the losses suffered by plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors or company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of the Company's ADSs and the subsequent significant decline in the value of the Company's ADSs when defendants' prior misrepresentations and other fraudulent conduct were revealed.

71.   At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and the other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Reckitt's business, operations and financial condition, as alleged herein. Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of Reckitt ADSs to be artificially inflated. Plaintiff and other Class members purchased Reckitt ADSs at those artificially inflated prices, causing them to suffer damages as complained of herein when the relevant truth was revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

72.   At all relevant times, the market for Reckitt ADSs was an efficient market for the following reasons, among others:

(a)   Reckitt ADSs were sponsored by the Company and represented Reckitt ordinary shares, which were listed and actively traded on the London Stock Exchange, a highly efficient and automated market;

(b)   According to the Company's 2018 Annual Report, there were more than 736 million Reckitt shares issued and outstanding, held by more than

17,000 nominees, individuals and institutional investors, representing a very broad and active trading market;

(c)    Reckitt regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(d)    Unexpected material news about Reckitt was rapidly reflected in and incorporated into the Company's ADS price during the Class Period.

73.    As a result of the foregoing, the market for Reckitt ADSs promptly digested current information regarding Reckitt from publicly available sources and reflected such information in the price of Reckitt ADSs.  Under these circumstances, all purchasers of Reckitt ADSs during the Class Period suffered similar injury through their purchase of Reckitt ADSs at artificially inflated prices, and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

74.    This is a class action on behalf of all purchasers of Reckitt ADSs during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives,

heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

75.    Common questions of law and fact predominate and include: (a) whether defendants violated the 1934 Act; (b) whether defendants omitted and/or misrepresented material facts; (c) whether defendants knew or recklessly disregarded that their statements were false; (d) whether the price of Reckitt ADSs was artificially inflated during the Class Period; and (e) the extent of and appropriate measure of damages.

76.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Reckitt ADSs were actively traded on the OTC.  Upon information and belief, these shares are held by thousands of geographically dispersed individuals.

77.    Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violations of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

78.    Plaintiff incorporates ¶¶1-77 by reference.

79. During the Class Period, defendants disseminated or approved the false statements specified above in ¶¶32-61, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

80. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Reckitt ADSs during the Class Period.

81. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Reckitt ADSs and suffered losses when the relevant truth was disclosed. Plaintiff and the Class would not have purchased Reckitt ADSs at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violations of §20(a) of the 1934 Act
### Against the Individual Defendants

82.    Plaintiff incorporates ¶¶1-81 by reference.

83.    The Individual Defendants acted as controlling persons of Reckitt within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Reckitt ADSs, the Individual Defendants had the power and authority to, and did, cause Reckitt to engage in the wrongful conduct complained of herein.  By reason of such conduct, these defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  July 15, 2019

SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
CHRISTOPHER L. AYERS

/s/ Christopher A. Seeger
CHRISTOPHER A. SEEGER
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone: 212-584-0700
Fax: 212-584-0799
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
cayers@seegerweiss.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
DAVID C. WALTON
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: 619-231-1058
Fax: 619-231-7423
davew@rgrdlaw.com
bcochran@rgrdlaw.com

VANOVERBEKE, MICHAUD &
 TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone: 313-578-1200
Fax: 313-578-1201 (fax)

Attorneys for Plaintiff